1

<pre>
 1                  IN THE UNITED STATES DISTRICT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                       WESTERN DIVISION

 3   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

     UNITED STATES OF AMERICA,
 4
                      Plaintiff,
 5
     vs.                              NO. 20-cr-20120-TLP-3
 6
     KRISTOPHER HARRIS,
 7
                      Defendant.
 8   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

 9                 MOTION TO SUPPRESS (RESUMED)

10                        BEFORE THE

11               HONORABLE THOMAS L. PARKER

12

13                    December 15, 2020

14

15

16

17

18

19          CATHERINE J. PHILLIPS, FAPR, RMR, CMRS
                      OFFICIAL REPORTER
20              FOURTH FLOOR FEDERAL BUILDING
                  MEMPHIS, TENNESSEE 38103
21

22

23

24

25

                     UNREDACTED TRANSCRIPT
</pre>

A

2

1                    A  P  P  E  A  R  A  N  C  E  S

2

3

4

5          Appearing on behalf of the Plaintiff:

6              WENDY K. CORNEJO, ESQUIRE
               U.S. Attorney's Office
7              167 N. Main Street, Suite 800
               Memphis, TN 38103
8              901.554.4231
               wendy.cornejo@usdoj.gov
9

10

11         Appearing on behalf of the Defendant:

12             TYRONE J. PAYLOR, ESQUIRE
               Federal Public Defender - Memphis
13             200 Jefferson Avenue, Suite 200
               Memphis, TN 38103
14             901.544.3895
               tyrone_paylor@fd.org

15

16

17

18

19

20

21

22

23

24

25

                         UNREDACTED TRANSCRIPT

1                              **I N D E X**

2

3                                                              **PAGE**

4     WITNESS: DET. DAVID HALLUM                                 **8**

5          DIRECT EXAMINATION (RESUMED) BY MS. CORNEJO           **9**

6          CROSS-EXAMINATION BY MR. PAYLOR                      **12**

7          REDIRECT EXAMINATION BY MS. CORNEJO                  **26**

8     CERTIFICATE                                               **54**

9

10

11    <u>EXHIBITS</u>                    (<u>DESCRIPTION</u>)              <u>PAGE</u>

12    Exhibit No. 2                                               **7**
      (Copy of photo lineup)
13
      Exhibit No. 3                                              **26**
14    (Original photo array)

15    Exhibit No. 4                                              **46**
      (Affidavit of Complaint)
16

17

18

19

20

21

22

23

24

25

4

1                          **Tuesday**

2                     **December 15, 2020**

3

4          The MOTION TO SUPPRESS (RESUMED) in this case began

5    on this date, Tuesday, December 15, 2020, at 1:30 p.m., when

6    and where evidence was introduced and proceedings were had as

7    follows:

8

9                      ----------------------

10               THE COURT:  Good afternoon.

11               MS. CORNEJO:  Good afternoon, Your Honor.

12               THE COURT:  This is in the matter of the United

13   States versus Kristopher Harris.  Ms. Cornejo is present on

14   behalf of the Government.  Mr. Paylor is here with his

15   client, Mr. Harris.

16               Mr. Paylor, do you need a minute?

17               MR. PAYLOR:  No, Your Honor, I'm good.

18               THE COURT:  Okay.  As y'all recall, we started

19   the hearing back on November 24th, and the Court paused the

20   hearing, if you will, so that the Government could obtain the

21   original copy of the photo lineup.

22               Under the circumstances, the Court finds that

23   giving the Government a chance to obtain that document was a

24   fair approach under the circumstances.  Although I understand

25   the defendant's desire to see and compare the original to the

1    colored copy that was provided in discovery, the defendant

2    didn't raise an issue about it until we got to court.  And

3    so -- for example, he didn't argue in the written motion that

4    the photocopy was in any way insufficient.  In fact, the

5    defendant attached a photocopy of the lineup to the motion to

6    suppress.  And then relied on that to argue that it was

7    unduly suggestive.

8              So he certainly has a right to compare it, and

9    we're going to make that happen.  And so I decided to take a

10   short recess of a few days to give the Government a chance to

11   obtain that.

12             So, Ms. Cornejo, have you had an opportunity to

13   obtain the original?

14             MS. CORNEJO:  Yes, Your Honor, I have a copy of

15   the original, and I've shown Mr. Paylor.  And I don't know at

16   this juncture if Your Honor would like to compare the

17   original to the copy?

18             THE COURT:  Yes, I think that would be fine.

19             MS. CORNEJO:  Okay.  I have the original here.

20             THE COURT:  I have a copy that was --

21             MS. CORNEJO:  Okay.  And I'm going to keep it in

22   the folder so, Your Honor, it doesn't -- thank you.

23             THE COURT:  And you have shown this to counsel?

24             MS. CORNEJO:  Yes, Your Honor.

25             THE COURT:  All right.  Now, what we can do to

6

1    ensure that the record is clean, I think what we'll probably

2    have to just make a copy of the original and return the

3    original back to the Government.  And I'll give you a chance

4    to be heard, Mr. Paylor, in just a minute.

5             But I do want to say that I've now compared the

6    original to the photocopy that was provided in the materials

7    by the parties in terms of -- the photocopy that was attached

8    to the documents.  And it's in color, the copy is in color,

9    the original is in color.  The Court does not see a marked

10   difference between the original and the photocopy.

11            Mr. Paylor, do you disagree with that or --

12            MR. PAYLOR:  Your Honor, I wanted to be heard,

13   because I didn't have an opportunity to compare the original

14   with the copy the Court had been previously provided.

15            THE COURT:  Sure.

16            MR. PAYLOR:  I compared the original toward

17   another copy that the Government had, and I notice some

18   differences in the original as opposed to the copy that the

19   Government showed me for comparison purposes.

20            I noticed that the original appeared to be

21   brighter, and you can tell when you look at the background of

22   each of the photos in the original as compared to the copy.

23            That's important, because what's at issue here is

24   the eye color of the individual in position one that was

25   identified by the witness.

1          So I understand the Court has ruled that there's

2    no marked difference between the copy the Court has and the

3    original.  I would suggest that the Court allow us to use the

4    original when questioning the witnesses, and mark as an

5    exhibit the copy the Court has.

6              THE COURT:  That's fine.

7              MR. PAYLOR:  Okay.

8              THE COURT:  Ms. Cornejo, I assume you don't have

9    an objection to that?

10             MS. CORNEJO:  No, Your Honor.  It's the

11   Government's position that the copy is a true and accurate

12   copy of the original.  And whatever Your Honor feels

13   comfortable -- for the record, we would just be seeking leave

14   to admit one of those into evidence, whatever the Court

15   decides in its discretion.

16             THE COURT:  So what I am looking at,

17   Mr. Paylor -- and I'm going to mark this as an exhibit to the

18   hearing -- it is just a color print -- a color printout of --

19   it's Page ID Number, I believe, 87.  And it is part of ECF

20   Document 47-1, and it's page 2 of 3 of that exhibit.

21             So I'm going to ask Mr. Knox to just mark that as

22   an exhibit.

23          (Exhibit No. 2 was admitted into evidence.)

24             THE COURT:  Is that Exhibit Number -- that's

25   Exhibit Number 2.  Okay.  Just so the record's clear about

1   what we're talking about.

2            And then, Ms. Cornejo, when we interrupted the

3   hearing, you had David Hallum on the witness stand and he had

4   introduced, I believe, the Advice of Rights for the photo

5   display, and you were going through that with him.  And then

6   Exhibit Number 2 was going to be the photo array and that's

7   when we stopped.

8            Do you want to call Mr. Hallum back?

9            MS. CORNEJO:  Yes, Your Honor.  And just so we're

10  clear, we're not starting over again; correct?  I can start

11  from Exhibit Number 2?

12           THE COURT:  That's fine with me.  I took notes on

13  what he said.

14           MS. CORNEJO:  All right.  Thank you very much.

15           THE COURT:  Yes, ma'am.

16           MS. CORNEJO:  If we could call Detective Hallum

17  to the stand again.

18        (Whereupon, Det. David Hallum duly sworn.)

19           THE WITNESS:  Yes, sir.

20           MS. CORNEJO:  May I have -- Exhibit 2, may I have

21  it please.

22           Thank you, sir.

23  THEREUPON,

24                    DET. DAVID HALLUM,

25  having been duly sworn, was examined and testified as

*TESTIMONY OF DET. DAVID HALLUM*                                    9

1    follows:

2                    DIRECT EXAMINATION (RESUMED)

3    BY MS. CORNEJO:

4    Q.     All right.  Good afternoon, Detective Hallum.  Can you

5    please spell and state your first and last name so the court

6    reporter can write it down.

7    A.     David Hallum, D-A-V-I-D, H-A-L-L-U-M.

8    Q.     Now, Detective Hallum, you were assigned to assist in

9    an investigation involving a carjacking with one of the

10   defendants, Mr. Kristopher Harris; correct?

11   A.     Yes.

12   Q.     And previously you had testified on November 24th,

13   2020, in this courtroom, did you not?

14   A.     Yes, I did.

15   Q.     I believe where we left off on August 14th of 2019,

16   did you show the victim in the carjacking a photo array?

17   A.     Yes.

18   Q.     In one of those photo arrays, was it a photo array

19   with the defendant, Kristopher Harris?

20   A.     Yes.

21   Q.     And can you tell us what happened after you showed the

22   victim the photo array.

23   A.     The victim identified Kristopher Harris.

24          MS. CORNEJO:  Your Honor, may I publish to the

25   Court, since Exhibit 2 has been admitted into evidence?

*TESTIMONY OF DET. DAVID HALLUM*                                    10

1           THE COURT:  Yes.

2           MS. CORNEJO:  Thank you, Your Honor.

3           THE COURT:  Any objection to that, Mr. Paylor?

4           MR. PAYLOR:  Your Honor, again, this is the copy,

5  not the original, right, just for the record?

6           THE COURT:  Yes, sir.

7  BY MS. CORNEJO:

8  Q.    Can you please tell us who the complaining witness

9  identified in this photo array?

10 A.    The picture in the top left corner.

11 Q.    All right.  And how did the complaining witness

12 indicate that that was the person that was involved in the

13 carjacking?

14 A.    He circled the photo and put his initials and the

15 date.

16 Q.    Did he also write something at the bottom of what's

17 been previously marked as Exhibit Number 2?

18 A.    Yes.

19 Q.    And what did the complaining witness write?

20 A.    This is carjacker that shot in my car.

21 Q.    Was the victim's signature also at the bottom of the

22 photo array to indicate that this was the person that he

23 identified --

24 A.    Yes.

25 Q.    -- as the shooter?  I'm sorry, as the shooter.

1   A.      Yes.

2   Q.      Do you see Mr. Harris in court today?

3   A.      Yes.

4   Q.      Can you please point to him and tell us something that

5   he is wearing.

6   A.      The male that's wearing the orange jacket.

7   Q.      And is the man that is seated here --

8              THE COURT:  Ms. Cornejo, I'm going to interrupt

9   you for a second.  Could we just have the witness hold the

10  microphone, and that way --

11             THE WITNESS:  Is this better?

12             THE COURT:  Yes, sir, much better.  Thank you.

13  BY MS. CORNEJO:

14  Q.      And, Detective Hallum, the man that is seated over

15  there, Kristopher Harris, is that the same Kristopher Harris

16  that the victim identified in the photo array on August 14th,

17  2019?

18  A.      Yes.

19  Q.      Did you tell the victim who to identify in the lineup?

20  A.      No.

21  Q.      Did you suggest to the victim who to identify in the

22  lineup?

23  A.      No.

24             MS. CORNEJO:  I have nothing further.

25             THE COURT:  Okay.  And where is the original?  Do

1   you have it?

2                MS. CORNEJO:  I have it right here, but if

3   Your Honor would like it for safekeeping.

4                THE COURT:  I think Mr. Paylor is going to want

5   to question with it.  That's all.

6                MS. CORNEJO:  Sure.  Here you go, Mr. Paylor, if

7   you need it. (Tendered.)

8                MR. PAYLOR:  I won't lose it.

9                THE COURT:  Mr. Paylor.

10               MR. PAYLOR:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. PAYLOR:

13   Q.     Detective Hallum, can you hear me fine?

14   A.     Yes, sir.

15   Q.     Okay.

16               MR. PAYLOR:  Can the court reporter hear me fine?

17               COURT REPORTER:  Yes, sir.

18   BY MR. PAYLOR:

19   Q.     Okay.  I have a few questions regarding your testimony

20   that you gave to us on November the 24th and today.

21          If you don't understand a question that I ask, if

22   you'll just ask me to repeat it and I will.  Okay?

23   A.     Okay.

24   Q.     Now, you were assigned to investigate this carjacking

25   that occurred on that night; is that right?

1  A.      Yes.

2  Q.      Okay.  And as a part of your investigation, did you

3  review any documents?

4  A.      Yes.

5  Q.      What documents did you review?

6  A.      I read over the incident report.  I read over the

7  report.  I read over the victim's statement.

8  Q.      Okay.  And the incident report, did it provide a

9  description of the individuals who were responsible for the

10 carjacking?

11 A.      I don't remember.

12 Q.      Okay.  Did the victim's statement provide a

13 description of the individuals who were responsible for the

14 carjacking?

15 A.      It did.  I don't remember exactly what it said,

16 though.

17 Q.      Do you recall reviewing any documentations during the

18 course of your investigation that identified any other

19 suspects as having light eyes or gray eyes?

20 A.      No.

21 Q.      You didn't review any of that information?

22 A.      Not that I'm aware of.

23 Q.      Okay.  Did you review any of the body cam footage from

24 the officers?

25 A.      No.

 1  Q.      So the extent of your investigation was you reviewed

 2  the documents that you just testified to, incident report,

 3  affidavit of complaint, and the victim's statement; is that

 4  right?

 5  A.      There were more, but, yes, that is what I said.

 6  Q.      What other documents did you review?

 7  A.      And then statements that two of the defendants gave

 8  me.

 9  Q.      No, I'm not asking you what you reviewed in

10  preparation for this hearing.  What I'm asking you is what

11  you reviewed during the course of your investigation of the

12  matter.

13  A.      Yes, during the course of my investigation I also

14  reviewed defendants' statements.

15  Q.      The statements from what defendants?

16  A.      From Kalonji Warren and Kristopher Harris.

17  Q.      Now, prior to you compiling this photo identification

18  and presenting it to the victim in this matter, Mr. Harris

19  hadn't been arrested; right?

20  A.      Correct.

21  Q.      So at that point in your investigation you had not

22  reviewed any statement from Mr. Harris; is that right?

23  A.      Correct.

24  Q.      At that point in your investigation, had you reviewed

25  any statements from any other defendants?

*TESTIMONY OF DET. DAVID HALLUM*                                15

1    A.      Kalonji Warren.

2    Q.      And do you recall if Mr. Warren's statement

3    identified, by physical description, any of the other

4    individuals that may have been involved?

5    A.      I don't recall if he provided a description.  He named

6    Kristopher Harris.

7    Q.      Okay.  Now, during your direct testimony on November

8    the 24th, 2020, you went over the process that you used to

9    generate the photo array; right?  Do you recall that?

10   A.      Yes.

11   Q.      And what you testified to is you use a program called

12   Mug Shots; is that right?

13   A.      Yes.

14   Q.      And that program is a computer-generated program that

15   stores all of the mug shots in a database; is that right?

16   A.      Yes.

17   Q.      And those mug shots include old people, young people,

18   black people, white people; right?

19   A.      Yes.

20   Q.      It also includes Hispanics and others; right?

21   A.      Yes.

22   Q.      So this program is, in essence, a database of all the

23   mug shots in -- is it Shelby County?

24   A.      As far as -- I don't know exactly what counties' mug

25   shots are loaded into it.  I do know that Shelby County's

1   booking photos are uploaded into it.

2   Q.      Okay.  So once you get in this program, you input

3   certain criteria; is that right?

4   A.      I input the first and last name.

5   Q.      To generate mug shots of a specific individual?

6   A.      People that have been booked into jail with that same

7   name.

8   Q.      Okay.  And once you've done that, you select that mug

9   shot -- you select a mug shot of that individual's name to be

10  used.

11  A.      Yes.

12  Q.      All right.  Now, once you select that mug shot, you

13  take that mug shot and do what with it?

14  A.      I click a random position button.

15  Q.      Okay.

16  A.      It moves that photo and populates it into a random

17  position in the lineup.

18  Q.      Okay.  And once that photo is put in a random

19  position, where do the other photos in the photo array come

20  from?

21  A.      There is a button you click for similar photos.

22  Q.      Okay.

23  A.      So I clicked it.

24  Q.      All right.  And when you click the button that says

25  similar photos, do you select which photos to use?

 1  A.      Yes.

 2  Q.      So in this program you click on similar photos; right?

 3  A.      Yes.

 4  Q.      And a population of photos is generated; is that

 5  right?

 6  A.      Yes.

 7  Q.      And this population can be thousands of photos?

 8  A.      Yes, it could be.

 9  Q.      And you go through that population of photos and

10  select individuals to be placed in this photo lineup; is that

11  right?

12  A.      Yes.

13  Q.      And when you're selecting the individuals to be placed

14  in that photo array, do you just select the first six people,

15  or what process do you use to select those individuals?

16  A.      I scroll through photos and find photos similar to

17  people I'm creating a lineup for.

18  Q.      Okay.  And when you're selecting people that are

19  similar to the photo -- to the mug shot that you selected,

20  what criteria do you use to determine who is and who isn't

21  similar?

22  A.      It varies.  Are you asking what I used for Kristopher

23  Harris or --

24  Q.      I'm asking you what process you use, and then I will

25  ask questions regarding --

1   A.      It just varies based on the individual I'm trying to

2   create a lineup for.

3   Q.      Okay.  So when you look at the photo -- the mug shot

4   that you start with, you see the eye color; is that right?

5   A.      Yeah, you can see the eye color.

6   Q.      Okay.  You see a hairstyle?

7   A.      Yeah.

8   Q.      You see tattoos?

9   A.      Yeah.

10  Q.      You see complexion?

11  A.      Yeah.

12  Q.      And you select five other individuals with similar eye

13  color; right?

14  A.      You can, yes.

15  Q.      Do you?

16  A.      If eye color jumps out at me, I will.

17  Q.      Okay.  Hairstyles, do you select individuals with

18  similar hairstyles?

19  A.      Yes.  If it's a distinct hairstyle, I will.

20  Q.      Do you select individuals with tattoos in similar

21  places?

22  A.      Yes.

23  Q.      And do you select individuals with similar skin

24  complexion?

25  A.      Skin complexion is a little tricky.  Lighting can

1    affect skin complexion based in the photo.  So that one's a

2    little more difficult.

3    Q.     But you see all the photos before you generate the

4    photo array; is that correct?  Right?

5    A.     Yes.

6    Q.     So whatever the lighting situation is, when you see

7    the skin complexion on the photo, you have the ability to

8    select that individual as similar skin complexion; is that

9    right?

10   A.     Yes, you do have the ability.

11   Q.     Okay.  Did you do those things in this particular

12   case?

13   A.     All of those things?

14   Q.     Yes.

15   A.     I don't remember all of the criteria that I used.

16   Q.     Do you remember any of the criteria you used?

17   A.     I know -- yes, I do.

18   Q.     So you testified that you used the criteria of young

19   black male, in their early twenties; is that right?

20   A.     No, I did not.

21   Q.     What did you use?

22   A.     Selected the similar photo, similar options button --

23   Q.     Right.

24   A.     -- and it generates -- I don't know the specific

25   criteria it uses.  It uses age, plus or minus so many years;

1    height, plus or minus so many inches; weight, plus or minus

2    so many pounds.

3    Q.      Okay.

4    A.      Hair color listed.  Eye color listed.  I don't know

5    what parameters the computer system uses to give me all of

6    those photos.

7    Q.      Okay.  What parameters do you use when you're viewing

8    that population of photos to come to your final photo array?

9    A.      It depends on how broad or how specific of a

10   description I have.

11   Q.      So what description were you provided in this case?

12   A.      If I remember correctly, the description that was

13   given in the victim's statement was fairly broad of

14   Kristopher Harris, of the person that fired the shot.

15   Q.      What description was that?

16   A.      A male black.  He had a mask on his face.  A hood

17   tied -- like a hoodie up over his hair.

18   Q.      So he did see the hair?  In his statement he didn't

19   give a hairstyle, hoodie over the head?

20   A.      If I recall, I don't think so, but I could be mistaken

21   in the statement.

22   Q.      Okay.  He testified that the individual had a mask on?

23   A.      Yes.

24   Q.      He testified that he could only see the eyes?

25   A.      I don't remember if he testified that he could only

1    see the eyes or not.

2    Q.      I'm sorry, I used the wrong word.  There's been no

3    testimony thus far.

4            In his statement, in the description he gave in his

5    statement, did he testify that he could only see the eyes?

6    A.      I don't remember.

7    Q.      Okay.  I'm going to show you --

8                  MR. PAYLOR:  May I see Exhibit 2, Your Honor.

9    BY MR. PAYLOR:

10   Q.      I'm displaying Exhibit 2 to you.  And these are the

11   individuals that you selected for this photo array; is that

12   right?

13   A.      Yes.

14   Q.      Okay.  Now, comparing number 5 to number 1, would you

15   say that number 5's complexion is lighter than number 1?

16   A.      It could be, yes.

17   Q.      What do you mean when you say it could be?

18   A.      I don't know the lighting conditions when the photo

19   was taken.  The lighting could have a flash when the camera

20   was taken, and that could make the appearance of number 5

21   having a lighter complexion.

22   Q.      Okay.  Sticking to the appearance on this photo array,

23   not what this person may actually look like outside of the

24   photo array.

25   A.      Okay.

1   Q.      But sticking to what you provided the victim in this

2   case, is it a fair statement that number 5 has a lighter

3   complexion than number 1?

4   A.      Yes.

5   Q.      And number 4 has a lighter complexion than number 1?

6   A.      Yes.

7   Q.      Are you able to see the eye complexion of number 4 and

8   number 2?

9   A.      Yes.

10  Q.      And do each of those individuals have dark-colored

11  eyes?

12  A.      They appear to from here.

13  Q.      Okay.  Does number 1 in this photo lineup appear to

14  have dark-colored eyes?

15  A.      They appear to, from here.

16  Q.      So -- I zoomed in.  And can you tell if number 1 has

17  dark-colored eyes in Exhibit 2?

18              THE COURT:  Sometimes looking at the smaller

19  monitor -- I'm noticing that the resolution on that big

20  screen's not great.  I don't know if that helps at all.

21              MR. PAYLOR:  Maybe I can just pass him the

22  exhibit.

23              THE COURT:  That will be fine.

24              MR. PAYLOR:  May I approach?

25              THE COURT:  Yes, sir.

1    BY MR. PAYLOR:

2    Q.      In comparing the eye color of number 1 to number 2,

3    can you tell from Exhibit 2 if number 1 has lighter eyes than

4    number 2?

5    A.      I can't tell from here.  Number 1's eyes look dark.

6    Number 2's eyes look almost black.

7    Q.      Okay.  Number 1 -- compare number 1's eye color to

8    number 3's eye color.  Does number 1's eyes appear lighter

9    than number 3?

10   A.      They look pretty close to being the same to me.

11   Q.      Okay.  Comparing number 1's eye color to number 4's

12   color.  Does number 1's eye color appear to be lighter on

13   Exhibit 2?

14   A.      Maybe.  It looks fairly close to me.

15   Q.      Okay.  Comparing number 1 to number 5 on Exhibit 2,

16   does number 1's eye color appear to be lighter?

17   A.      They all look pretty close to me.

18   Q.      Okay.  Comparing number 1 to number 6 on Exhibit 2,

19   does number 1's eye color appear to be lighter?

20   A.      It could be.  They look pretty close to me, all of

21   them do.

22   Q.      Okay.

23           MR. PAYLOR:  Your Honor, I'm going to pass the

24   witness the original.

25           THE COURT:  Okay.

1              MR. PAYLOR:  And I'll take Exhibit 2 back.

2    BY MR. PAYLOR:

3    Q.      Now, looking at the original that I just passed to

4    you, do the photos in the original document appear to be

5    lighter in color than Exhibit 2?  And if you need Exhibit 2

6    back, I can pass it back to you.

7    A.      Can I see it again?

8    Q.      (Tendered.)

9    A.      (Reviewing exhibits.)

10   Q.      Let me know when you're finished comparing the two.

11   A.      All right.

12   Q.      Is it a fair statement that the original -- the

13   overall appearance of every photo in the original is lighter

14   than that in Exhibit 2?

15   A.      Yes.

16   Q.      And in the original can you see that the individual in

17   position 1 has lighter eyes than the individual in position

18   number 2?

19   A.      Yes.

20   Q.      Can you see that the individual in position number 1

21   has lighter eyes than the individual in position number 3?

22   A.      He may have lighter eyes.  They're pretty close to me.

23   Q.      And the individual in number 1 compared to the

24   individual in number 4, number 1 would have the lighter eyes;

25   is that right?

1   A.      Yes.

2   Q.      And the individual in number 1 to the individual in

3   number 5, number 1 has lighter eyes than the individual in

4   number 5; is that right?

5   A.      I mean, yeah, he could have.

6   Q.      And the individual in position number 1 to the

7   individual in position number 6, that individual appears to

8   have lighter eyes; is that right?

9   A.      Yes.

10  Q.      Could I have those exhibits back.

11          THE COURT:  Mr. Paylor, why don't we go ahead and

12  mark -- Ms. Cornejo, I think we should probably mark

13  exhibit -- the original document.  Just so the record's

14  clear, we'll make a photocopy and give you the original back.

15  But I think we need to show for the record that we compared

16  the documents.

17          MS. CORNEJO:  Yes, Your Honor.  No objection.

18          THE COURT:  Do you agree, Mr. Paylor?

19          MR. PAYLOR:  I do, Your Honor.

20          CASE MANAGER:  Will it be Exhibit 3?  Is this for

21  ID or we'll be admitting it?

22          THE COURT:  We'll call it Exhibit Number 3.

23  We're going to admit that as the original photo array that

24  was marked by the witness.  And then we will substitute a

25  photocopy of that document in our record.

1          (Exhibit No. 3 was admitted into evidence.)

2              MR. PAYLOR:  Can I just leave this exhibit here

3     in case Ms. Cornejo --

4              THE COURT:  Certainly.

5     BY MR. PAYLOR:

6     Q.    Now, Detective Hallum, just to be clear, you don't

7     have any recollection of what the victim identified

8     Mr. Harris as appearing to look like; is that right?

9     A.    I did not take the victim's statement from the victim.

10    Q.    I mean, but from your review of that statement you

11    just don't recall what that description was?

12    A.    I don't remember specifics.  I do remember that it was

13    a broad description, but I don't remember specifics on what

14    he said.

15             MR. PAYLOR:  All right.  Nothing further,

16    Your Honor.

17             THE COURT:  All right.  Ms. Cornejo, redirect?

18             MS. CORNEJO:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20    BY MS. CORNEJO:

21    Q.    Very briefly, Detective.

22          You previously testified under cross that you did not

23    take the signed statement by the complaining witness in this

24    matter; correct?

25    A.    Yes.

*TESTIMONY OF DET. DAVID HALLUM*                              27

1   Q.      Prior to showing the victim the photo array on

2   August 14th, 2019, did you have a conversation with Kalonji

3   Warren?

4   A.      Yes.

5   Q.      And I know you've previously testified to this, but

6   did Kalonji Warren implicate anybody else by name as involved

7   in the carjacking with him?

8   A.      Yes.

9   Q.      Who was that?

10  A.      Kristopher Harris.

11  Q.      Based on that conversation with Kalonji Warren, what

12  did you do next?

13  A.      I generated the photo lineup.

14  Q.      Can you tell the Court the specific reason why you

15  picked Mr. Harris to be in the photo array?

16  A.      He was named by Kalonji Warren.

17  Q.      Now, counsel asked you a lot of questions about skin

18  tone and eye color, do you remember that, under

19  cross-examination?

20  A.      Yes.

21          MS. CORNEJO:  For the record, I am publishing

22  Exhibit Number 2 that has been previously -- that has been

23  entered.

24          THE COURT:  Yes, ma'am.

25          MS. CORNEJO:  Thank you, Your Honor.

*TESTIMONY OF DET. DAVID HALLUM*                                28

1   BY MS. CORNEJO:

2   Q.      Now, again, who is in position number 1 in this

3   photograph?

4   A.      Kristopher Harris.

5   Q.      And if you had to state -- you previously identified

6   Mr. Harris as the man in the orange jumpsuit seated at

7   defense table; correct?

8   A.      Yes.

9   Q.      Would you say that the photograph of Mr. Harris is

10  darker or lighter -- does his complexion look darker or

11  lighter in the photograph as opposed to real person?

12  A.      Can we turn the lights back on?

13          MS. CORNEJO:  Yes, sir.  Your Honor, if we may.

14          THE WITNESS:  The photograph looks darker to me.

15  BY MS. CORNEJO:

16  Q.      And, again, can you explain what would the variation

17  of that be?

18  A.      Lighting conditions when he's booked in the jail,

19  camera settings could have something to do with it.  I don't

20  know.

21  Q.      Just to be clear, who circled number 1 in the photo

22  array?

23  A.      The victim.

24  Q.      Did you tell the victim who to identify?

25  A.      No.

1              MS. CORNEJO:  Nothing further.

2              THE COURT:  All right.  Thank you, Mr. Hallum.

3      You're excused.

4                    (Whereupon, witness excused.)

5              THE COURT:  Could I see Exhibits 2 and 3.

6              MS. CORNEJO:  Yes, Your Honor.

7              THE COURT:  All right.  Ms. Cornejo?

8              MS. CORNEJO:  Your Honor, I understand that we

9      have previously -- the Government will be seeking leave to

10     call the complaining witness in this case.

11             THE COURT:  Yes, ma'am.

12             MS. CORNEJO:  Mr. Stevens.  David Stevens.

13             THE COURT:  David Stevens.

14             MS. CORNEJO:  Yes, sir.

15             MR. PAYLOR:  Your Honor, can I request Jencks

16     material at this point, so that I can have it to review

17     before I cross-exam?

18             MS. CORNEJO:  I don't have any Jencks material --

19     I don't know what kind of Jencks material you would be

20     requesting.  He has never testified.

21             THE COURT:  You all want to come around.

22         (Whereupon, there was a side bar conference.)

23             THE COURT:  If you would just speak into the mic.

24     Is there anything in particular, Mr. Paylor, you're

25     expecting?

1          MR. PAYLOR:  Well, the officer just testified

2    that he provided --

3          THE COURT:  Took a statement?

4          MR. PAYLOR:  -- took a statement.

5          THE COURT:  Right.

6          MR. PAYLOR:  So that would be Jencks material.

7          THE COURT:  Okay.

8          MS. CORNEJO:  I think we tendered that statement

9    to you.

10         THE COURT:  Do you have it?  It was part of

11   discovery.

12         MR. PAYLOR:  I don't recall having that as part

13   of discovery.

14         THE COURT:  That surprises me.

15         MR. PAYLOR:  I mean, I can look to see if it's in

16   my discovery, but, typically, I don't.

17         If you have a copy of it, it would just be easy

18   to --

19         MS. CORNEJO:  So here's my only --

20         THE COURT:  You wouldn't get a copy of a witness

21   statement as a part of discovery?

22         MR. PAYLOR:  The Government typically doesn't

23   provide copies of victim's statements to us until a trial or

24   some other kind of hearing.

25         THE COURT:  Well, you've been talking about an

UNREDACTED TRANSCRIPT

1    aspect of the statement --

2              MR. PAYLOR:  That I got from the dash cam review.

3              THE COURT:  I've got you.  Okay.

4              MR. PAYLOR:  If there is nothing, if the

5    Government's saying there --

6              THE COURT:  Do you have --

7              MS. CORNEJO:  We do have a victim's statement.

8    I'll double check and see if we've tendered it.  But before

9    we --

10             MR. PAYLOR:  I can look at my computer real

11   quick.

12             MS. CORNEJO:  Before we proceed, I know we've

13   gone over this again.  I don't feel that we should have to

14   put our victim on right now.  At this juncture he has not

15   made any showing that this is unduly suggestive.  If

16   Your Honor makes a finding that the lineup was unduly

17   suggestive, then the Government has to rebut that.

18             I think us having to put the victim on the stand

19   is papering him up for trial.  And at this juncture, I don't

20   think counsel has met his burden.

21             MR. PAYLOR:  I would disagree, Your Honor, if you

22   want to hear arguments on that now.  I would disagree.  I

23   think the witness -- the only witness that has testified has

24   testified that one individual has lighter eyes than the other

25   individuals.  That same witness testified that he was the one

1  responsible for generating the photo lineup.  That it wasn't

2  computer-generated randomly.  There was a computer --

3            THE COURT:  Say that again.

4            MR. PAYLOR:  It wasn't computer-generated

5  randomly.

6            THE COURT:  It was not?

7            MR. PAYLOR:  It was not.  There was a computer

8  generation of a population of individuals that he could

9  select from.  And he testified that he went in and selected

10 the individuals to be placed in this photo lineup.  And he

11 did that with the person in position number 1, then the only

12 one with light eyes.  And it's my position that this victim

13 is going to testify that he provided a description to the

14 officers that the individual involved had gray eyes.

15            So I think I've met my burden as it relates to

16 the first part of the test.

17            THE COURT:  What is that test?

18            MR. PAYLOR:  That there is subjectiveness in the

19 photo lineup.

20            THE COURT:  I think it's actually that it's

21 unduly suggestive.

22            MR. PAYLOR:  Right, unduly suggestive.

23            THE COURT:  Right.  Which that's a burden.  And

24 so the last time we were here you asked that we get the

25 original, and that the Court at least have the original so

1   that you could examine the witnesses from it.

2            So what about the photo array -- you have focused

3   on the eye color of your client versus -- and your client's

4   photograph versus the other five photographs in the photo

5   array.

6            MR. PAYLOR:  That were presented to the victim.

7            THE COURT:  Okay.  What else about the photo

8   array from your perspective was unduly suggestive?

9            MR. PAYLOR:  The eye color.

10           THE COURT:  Period, end of story.

11           MR. PAYLOR:  The eye color.  Because this

12  witness, he was in -- the first thing out of his mouth on his

13  body cam was, they had light -- they had gray eyes.  Which is

14  indicative of someone being responsible who had light-colored

15  eyes.

16           THE COURT:  Okay.  But do you agree with the

17  Government that before we get to -- I'm not saying that you

18  agree with her in terms of the conclusion she's drawing,

19  other than -- it's a two-step process.  You've got to first

20  raise a question about the suggestiveness of the photo array

21  before they go further into proving, you know, the rest of

22  what might be called upon in a hearing like this.

23           MR. PAYLOR:  I do agree that I have to point to

24  something in this photo array that is unduly suggestive.  And

25  my argument is the fact that only one individual in this

1    photo array has light eyes.  It's unduly suggestive to a

2    victim who --

3               THE COURT:  Who mentioned the eyes out of the

4    gate --

5               MR. PAYLOR:  Right.

6               THE COURT:  -- if you will.

7               MR. PAYLOR:  And as the witness testified, the

8    victim testified that the person he saw had a mask over the

9    lower part of his face and a hood over the top part of his

10   face.

11              THE COURT:  So the eyes were very important.

12              MR. PAYLOR:  Right.

13              THE COURT:  All right.  Ms. Cornejo, why

14   shouldn't we go further?

15              MS. CORNEJO:  Because as Detective Hallum

16   testified, he did not rely on anything the victim had said.

17   He did not interview the victim.  The main reason Mr. Harris

18   was picked to be in this photo array -- and, quite frankly,

19   one of the only reasons, it's our position, is because he was

20   implicated by Kalonji Warren.  He was identified by Kalonji

21   Warren by name.  So --

22              And, respectfully, we would argue this was a

23   computer-generated photo array.  He put in Kalonji Warren's

24   name and --

25              THE COURT:  You mean Kristopher Harris.

1          MS. CORNEJO:  I'm sorry.  I apologize.  It all

2    gets mixed up.

3          THE COURT:  I understand.

4          MS. CORNEJO:  Again, I understand counsel's

5    position and we're willing to move forward.  We just wanted

6    the record to be clear that at this juncture we're objecting

7    to having to go on to step 2, if that's what Your Honor

8    rules, just simply because it is our position that we don't

9    feel that the defense has met its burden.

10         MR. PAYLOR:  I would add that the Government kind

11   of glosses over the fact that the witness testified that he

12   reviewed the incident report, the affidavit of complaint, and

13   the victim's statement in this matter.  Not just --

14         THE COURT:  In preparation for his testimony, I

15   thought.

16         MR. PAYLOR:  He said -- I went back and clarified

17   what he reviewed at that juncture in the investigation.  And

18   he said he reviewed the incident report, the affidavit of

19   complaint, and the victim's statement, as well as the

20   statement of someone else involved in --

21         THE COURT:  But he didn't say that he had

22   reviewed the body cam, did he?

23         MR. PAYLOR:  No, not the body cam.

24         THE COURT:  Okay.  And I haven't seen the

25   victim's statement yet.

1              MR. PAYLOR:  Right.

2              THE COURT:  All right.  Let me -- let's take a

3     break real quick.  I'm going to consult my lawyer and we'll

4     come back.

5              MR. PAYLOR:  Okay.

6              MS. CORNEJO:  Thank you.

7       (Whereupon, the side bar conference concluded and a recess

8                          was had.)

9              CASE MANAGER:  All rise.  This Court stands in a

10    brief recess.

11             THE COURT:  All right.  We're back on the record

12    in the matter of United States versus Kristopher Harris.

13             Mr. Paylor, the Government is arguing that there

14    are two steps to the analysis; one, that you first have to

15    show that the photo array was unduly suggestive.  And if the

16    Court finds that the photo array is not unduly suggestive,

17    then we don't even go to the rest of the analysis.

18             Do you agree with that position?

19             MR. PAYLOR:  Your Honor, I agree that there is

20    two requirements before a photo identification can be

21    excluded from the proceedings.  And those -- the two steps

22    are that the photo -- or the identification itself is unduly

23    suggestive by either impermissibly suggestive or --

24             THE COURT:  I'm having a hard time hearing you.

25    Do you have your mic on?

1   MR. PAYLOR:  Yes.  It's our position that before

2   a Court can exclude a photo identification, the Court has to

3   determine that the photo is unduly suggestive, meaning that

4   it is impermissibly suggestive, unnecessarily suggestive, and

5   in the totality of the circumstances that the photo

6   identification is unreliable.  So I believe those are the two

7   parts a Court has to determine.

8   THE COURT:  But if the Court makes a

9   determination that the photo array is not unnecessarily,

10  unduly, however you want to describe in step 1, that the

11  photo array was improper, say that, is there any need to go

12  further with the hearing?

13  MR. PAYLOR:  I believe it is, Your Honor.  For

14  the simple fact that we're creating a record that would be

15  subject to appellate review.  So if the Court stops the

16  hearing after that finding, and an Appellate Court determines

17  that the Court may have erred, then we still have to come

18  back to answer this totality of the circumstances portion,

19  which we can do in the --

20  THE COURT:  Well, but am I right -- the way I

21  read the cases is the only way you get to step 2 is if you

22  find that step 1 was met.

23  Do you agree with that?

24  MR. PAYLOR:  I agree that it's our burden to show

25  to the Court that the photo --

1          THE COURT:  That's not what I'm saying.  I'm not

2    talking about whose burden it is.  I'm saying, if the Court

3    finds that the photo array is not unduly suggestive, could

4    number 2 somehow override number 1?  In other words, could

5    the totality of circumstances still apply to the point where

6    I wouldn't allow the identification?

7          MR. PAYLOR:  I think it could if Your Honor was

8    saying that it's a close call that it's unduly suggestive or

9    not.  And the totality of the circumstances makes the Court

10   lean towards one direction or the other.

11          But if the Court clearly says it's not unduly

12   suggestive and it's not even a close call, then the Court is

13   free to, you know, make whatever ruling the Court wants and

14   stop the hearing.

15          THE COURT:  Okay.

16          MR. PAYLOR:  If the Court wanted to.  But I think

17   it's supposed to go completely through the process --

18          THE COURT:  All right.

19          MR. PAYLOR:  -- and the Court make a

20   determination.

21          THE COURT:  Thank you, Mr. Paylor.

22          MR. PAYLOR:  Okay.

23          THE COURT:  Ms. Cornejo, Mr. Paylor wants to have

24   his cake and eat it too.  So here's the way I look at it.

25   If --

1      Let me ask you this, Mr. Paylor.  Let's say that

2  Ms. Cornejo says, Judge, we're going to hold right here.

3  We're going to stop here and let the Court rule.

4      Do you have any proof on the subject of whether

5  the photo array is suggestive?  Do you have any other proof

6  to put on?

7            MR. PAYLOR:  No, Your Honor.  I think --

8            THE COURT:  You would just argue from the --

9            MR. PAYLOR:  I would just argue based on -- the

10  only proof we could have regarding the photo array being

11  suggestive is the testimony of the officer that generated it.

12            THE COURT:  Oh, I'm not suggesting you do need

13  it.  I, just for the record, wanted to point out you don't

14  have anybody that you would call in terms of rebuttal or

15  anything like that?

16            MR. PAYLOR:  No.

17            THE COURT:  Okay.  All right.  Well, Ms. Cornejo?

18            MS. CORNEJO:  Your Honor, at this point we rest.

19            THE COURT:  All right.

20            MS. CORNEJO:  May I make the record very clear

21  though.  We do have the victim here, but we are not calling

22  the victim to testify, because it is our position that step 1

23  of -- that the photo array was not unduly suggestive.

24            THE COURT:  Okay.  Mr. Paylor, we had a brief

25  argument here at side bar.  Is there anything you want to say

1    about the photo array that -- you know, to make sure that the

2    record is complete before I rule?

3                MR. PAYLOR:  Well, Your Honor, I would like to

4    have admitted as a part of this hearing a copy of the

5    affidavit of complaint that the witness testified he

6    reviewed.  And in that affidavit of complaint I asked the

7    witness directly whether or not he reviewed any body cam

8    footage in this situation, and he testified that he did not.

9    But the affidavit of complaint suggests otherwise.

10                THE COURT:  Do you have a copy of it?

11                MR. PAYLOR:  I don't have it printed out.  I can

12    print it out.

13                THE COURT:  Do you have a copy?

14                MS. CORNEJO:  Yes, Your Honor.

15                THE COURT:  All right.  Do you have any objection

16    to making that a part of the record?

17                MS. CORNEJO:  No, Your Honor.

18                MR. PAYLOR:  Let me see if that's the same

19    document I'm referring to.

20                THE COURT:  Yes, let's make sure we're talking

21    about the same thing.

22                     (Reviewing document.)

23                MR. PAYLOR:  That's not the one I'm referring to.

24                MS. CORNEJO:  Which one did you want?  The one

25    for --

1          MR. PAYLOR:  The one that was prepared by

2    Detective Hallum.

3          MS. CORNEJO:  The affidavit of complaint?  Which

4    one is that one?

5          MR. PAYLOR:  I'm going to refer --

6          MS. CORNEJO:  Okay.  I'll look for it.

7          Point me in the right direction.  I'll be more

8    than willing to help you.

9          MR. PAYLOR:  I'm just getting to the Bates number

10   so that I can provide that to you, which will make it a lot

11   easier.

12         THE COURT:  We'll go off the record until y'all

13   find the document.

14                   (Off-the-record.)

15         MS. CORNEJO:  (Indicating.)

16         MR. PAYLOR:  Yes, this is the one.

17         MS. CORNEJO:  Okay.  I object.  It's an affidavit

18   of complaint for the arrest of Kalonji Warren, which has

19   nothing to do with the affidavit of complaint -- which I have

20   no objection to Mr. Harris' affidavit of complaint being

21   tendered to the Court, but I don't believe that this is

22   relevant.

23         THE COURT:  So there are two different affidavits

24   of complaint, one for the co-defendant and one for

25   Mr. Harris?

UNREDACTED TRANSCRIPT

1              MS. CORNEJO:  Correct.

2              MR. PAYLOR:  One for the co-defendant that the

3    witness testified that he reviewed his statement, he reviewed

4    the affidavit of complaint regarding this incident.  And this

5    affidavit of complaint states, and is signed by Detective

6    Hallum, that he reviewed the body cam footage, which he

7    indicated he did not.  So I think it's relevant for purposes

8    of --

9              THE COURT:  Who reviewed the body cam footage?

10             MR. PAYLOR:  Detective Hallum.  That's what this

11   affidavit says.  And it's signed by him.

12             THE COURT:  Okay.  Well, I'm not sure what weight

13   it deserves, but I'll consider it.  Mr. Paylor, if you'll

14   hand that forward.  We'll make a copy of that.  And while

15   Mr. Knox is making a copy, Mr. Paylor, why don't you make

16   whatever arguments you want to make as to why I should find

17   that the photo array is unduly suggestive or

18   should otherwise -- well, yeah, and grant your motion to

19   suppress.

20             MR. PAYLOR:  Okay.  Your Honor --

21             THE COURT:  And speak up.

22             MR. PAYLOR:  Your Honor, in support of my motion

23   to suppress the photo identification, you've heard testimony

24   from Detective Hallum.  In that testimony Detective Hallum

25   indicated that he was responsible for generating the photo

1  lineup after he reviewed the affidavit of complaints in this

2  incident, after he reviewed the incident report, after he

3  reviewed the victim's statement, and after he reviewed the

4  defendant's statement.  And when asked what defendants he was

5  referring to on cross-examination, he indicated that he was

6  referring to the defendant's statement of Kalonji Warren.

7  Because Mr. Harris had not yet been arrested in this matter.

8           So in reviewing those things, he generated a

9  photo lineup.  He used a program called Mug Shots to generate

10  all the mug shots that he may have for individuals known as

11  Kristopher Harris.  He individually went through those mug

12  shots, selected a mug shot to use, and then pushed a button

13  for similar individuals.  He pushed that button and a

14  population of like individuals was generated.  He testified

15  that he went through that population and chose five other

16  people that he believed to be similar in appearance to

17  Mr. Harris.

18           On cross-examination, when comparing the

19  individuals in Exhibit Number 2, which is the copy, the

20  witness testified that he could not see any noticeably

21  differences in the eye color of any of those individuals.

22           When I provided him with the original document

23  and asked him the same, he indicated that he could see a

24  difference in the color of the eyes of the individuals in the

25  photo array.  This is a photo array that was generated by

1   Detective Hallum.  This is a photo array that the individuals

2   in the photo array were selected by Detective Hallum.

3          Now, when I asked Detective Hallum if he recalls

4   the description that the victim provided to him of the

5   individuals responsible, he said he didn't recall.  He didn't

6   say he doesn't remember, because logic dictates that at the

7   time you're generating this photo lineup, you have to have

8   some descriptive features of someone to place in --

9          THE COURT:  But he had the name.

10          MR. PAYLOR:  He had the name of the individual.

11          THE COURT:  Yes.

12          MR. PAYLOR:  But he had to have other similar

13   descriptions of individuals for the victim to select from.

14          If one individual in a photo lineup has light

15   eyes and the victim is alleging that the individual who

16   committed the offense had light eyes, then it's more --

17   there's a greater likelihood that a victim will select a

18   person with lighter eyes if comparing to other individuals

19   without light eyes.

20          And on the photo array, it's our position that

21   the only individual on there with light eyes is Mr. Harris.

22   That in and of itself, it's our position, is suggestive.  And

23   it becomes unnecessarily suggestive when the officer has -- I

24   asked him, were there thousands of people to select from?  He

25   indicated, yes, it's a whole lot of them.

UNREDACTED TRANSCRIPT

1          So when the officer has an opportunity to select

2     other individuals with a characteristic of the perpetrators

3     of this offense that the victim has described, and that you

4     can see on the photo of Mr. Harris what color his eyes is --

5     what color his eyes are, then the officer should go the next

6     step to make sure that the other individuals in that photo

7     array have similar colored eyes.

8          So that's what makes it unduly or unnecessarily

9     suggestive in our opinion.

10          THE COURT:  Okay.  Ms. Cornejo, if you would like

11    to be heard, I'm happy to hear you.  I heard you over here.

12          MS. CORNEJO:  Your Honor, we rest on our response

13    in our motion.  The only thing we would like to say is all

14    the arguments that counsel is making, it is the Government's

15    position that ultimately to exclude this evidence, Your Honor

16    would have to find that this was an unduly suggestive lineup.

17          But, ultimately, Your Honor, if Your Honor does

18    find that it was not unduly suggestive, the arguments that

19    counsel makes, with all due respect, that's not appropriate

20    before a trier of fact.  It will be up to the trier of fact,

21    whether it's a bench trial or jury trial, you know, to weigh

22    the evidence, make the comparison of the eyes, and the skin

23    tone, and assess the credibility of all the witnesses.

24          It is just -- simply at this juncture, we believe

25    that excluding this testimony doesn't go to the extraordinary

```
 1   circumstances that have been suggested throughout various
 2   circuits.
 3                 So based on everything, we respectfully ask that
 4   you deny counsel's motion.
 5                 THE COURT:  Okay.  I'm going to mark the
 6   complaint -- the affidavit of complaint that Mr. Paylor asked
 7   me to consider as Exhibit Number 4.
 8           (Exhibit No. 4 was admitted into evidence.)
 9                 THE COURT:  Mr. Paylor, you're standing.  Is
10   there something else you wanted to say?
11                 MR. PAYLOR:  I just had a brief response to the
12   Government's position, Your Honor.
13                 THE COURT:  Yes, sir.
14                 MR. PAYLOR:  While the Government may think that
15   this type of hearing is something for a jury to decide, I
16   would respectfully disagree, Your Honor.  This is a pure
17   legal question.  It's akin to any other type of motion to
18   suppress.  And we don't get to argue before a jury that this
19   evidence shouldn't be admitted.  The Court gets to decide
20   that.
21                 And under these circumstances, the Government
22   hasn't provided the Court with anything as it relates to a
23   totality of the circumstances to compare, to determine if the
24   Court determines that the photo array is unduly suggestive,
25   what do you have now?  The only other option you have is to
```

1   exclude it, because the Government hasn't provided the Court

2   with any testimony as to a totality of the circumstances as

3   to why it shouldn't be excluded.  So it's not a question for

4   a jury at this point, it's a pure legal question, Your Honor.

5          THE COURT:  Okay.  Mr. Paylor, I think the

6   Government would agree that they're taking a gamble here.

7   Because if I do find that the photo array is unduly

8   suggestive, they have not presented evidence about the

9   totality of the circumstances and so that's a risk they're

10  willing to take.

11         So I'm going to read Exhibit Number 4 real quick,

12  and then I'll get back with you.

13             (Court reviewing document.)

14         All right.  So the Court has reviewed the

15  Affidavit of Complaint, Exhibit Number 4, and there's

16  absolutely nothing in here about the person's eyes.  There's

17  no reference to the person who fired the shot, that person's

18  not described in the affidavit of complaint which is Exhibit

19  Number 4.

20         Now, the Court would agree with the parties that

21  at this point we are dealing with a motion to suppress that

22  is arguing that the evidence of the identification of

23  Mr. Harris, based on the photo spread that was shown to him,

24  that there are two -- well, the motion argues that the

25  identification should be suppressed.  The evidence of that

1    identification should be suppressed for two -- well, because

2    the photo array is unduly suggestive.

3           The Sixth Circuit has found that in order to

4    suppress a photo identification, the Court should conduct a

5    two-part test.  First, the defendant bears the burden of

6    proving that the identification procedure was impermissibly

7    suggestive.

8           The defendant in this case relies on the actual

9    appearance of the six individuals shown in the photo array as

10   opposed to anything said to the witness and the like.  There

11   was no argument about anything other than the appearance of

12   the individual photographs.

13          So the defendant has to convince the Court that

14   the photo array was unduly suggestive.  In, I believe it's

15   Haliym, H-A-L-I-Y-M, versus Mitchell, which is a Sixth

16   Circuit case from 2007, 492 F.3d 680, the Court said, quote,

17   unnecessarily suggestive -- excuse me, unnecessary

18   suggestiveness depends upon whether the witness's attention

19   was directed to a suspect because of police conduct.  That's

20   the quote.

21          Now, in that case the Court found that the lineup

22   in that case was unduly suggestive because the lineup

23   contained five individuals, same race, same approximate age

24   and stature, but only one person was bandaged and dressed in

25   prison clothing.

1           And the Court found that those distinctions

2    clearly singled out that petitioner such that the procedure

3    contained a very substantial likelihood of irreparable

4    misidentification.  But, here, it is not clear that the

5    defendant's eyes set him apart from the other individuals in

6    the photo array.

7           If the Court -- and I'm going to look at Exhibit

8    Number 3, which is the original, the one that the witness

9    actually used.  I'm looking at the photo array, and one thing

10   I notice about the person in photograph number 1, who turns

11   out to be the defendant, is that his eyes are actually

12   looking down and to the right.  They're not looking directly

13   into the camera.  And what that suggests to the person who's

14   looking at that photo array is that the light could have

15   something to do with the appearance of the eyes there.

16          Having said all of that, as I look at the other

17   individuals also depicted, there may be some slight variation

18   among the six individuals in terms of their eye color,

19   perhaps even their complexion, one person might have -- their

20   hair might be a little taller than the other.  But when you

21   consider the overall appearance of the photo spread, no one

22   is singled out in any way.  These are what appear to be

23   African American males who are roughly the same age.  And the

24   one individual, who's number 2, includes the height, the

25   person's 5'8".  All the other ones have lines behind that are

1    otherwise undescribed, or there are no other markings other

2    than the lines behind them.  Some of the individuals are

3    looking directly into the camera.

4              I think, Mr. Paylor, if you look carefully at

5    number 4, his eyes look maybe a little lighter than some of

6    the others, but there is not enough of a difference between

7    the person depicted in number 1 and the individuals depicted

8    elsewhere in this photo spread.

9              Now, I'm going to call your attention to the case

10   of United States versus Sullivan, that's a case that is

11   another Sixth Circuit case, 431 F.3d 976, 985 is the precise

12   page.  It's a Sixth Circuit 2005 opinion, in which the Sixth

13   Circuit affirmed the Court below.

14             And in that case the defendant argued that his

15   picture was emphasized in a photo array because he was the

16   only suspect in the entire lineup with noticeably blue eyes.

17   And a majority of the witnesses described the robber as

18   having blue eyes.  The magistrate judge found in that case,

19   it was agreed to by the District Court and the Sixth Circuit,

20   the magistrate judge found that the photo array was not

21   unduly suggestive.  Because looking at the quality of the

22   photographs and the characteristics of the individual in the

23   lineup, the individual's eye color was not easily

24   ascertained, and so it did not improperly single out the

25   defendant.

1        So as I'm looking at this, I will say, that -- I

2   think, Mr. Paylor, you have used the description as having

3   gray eyes.  I would say, if anything, Mr. Harris's eyes

4   appear to be brown in this photograph.  Some might call it

5   hazel eyes, I don't know.  I'm looking at him from here and

6   his eyes don't look all that light to me from here.

7        So as I'm looking at the other individuals in the

8   photographs, some of the eyes are somewhat lighter, darker,

9   it just -- it doesn't stick out is the point I would make

10  about the eye color.

11       The Court finds that this case is similar to the

12  Sullivan case.  The difference between the defendant's hazel

13  eyes or brown eyes and the other individual's brown eyes is

14  very minor and does not appear to single out the defendant.

15       So the Court finds that the defendant has not met

16  his burden to show that the photo array is unduly suggestive;

17  and, therefore, the Court is going to deny the motion to

18  suppress.

19       Ms. Cornejo, did I overlook anything?

20       MS. CORNEJO:  No, Your Honor.

21       THE COURT:  Mr. -- while I've got you standing,

22  is there anything else you want to cover this afternoon?

23       MS. CORNEJO:  Your Honor, I believe we have a

24  report date coming up later on this week, if not tomorrow.

25       THE COURT:  Well, should we go ahead and dispense

```
 1   with that?

 2             Mr. Paylor, first of all, anything else we need

 3   to cover this afternoon?

 4             MR. PAYLOR:  Well, Your Honor, we have two

 5   co-defendants, so I guess --

 6             THE COURT:  Oh, okay.

 7             MR. PAYLOR:  -- and they're set tomorrow as well,

 8   so I don't think we can dispense with it.

 9             THE COURT:  All right.  Well, we'll look to see

10   y'all tomorrow.  Is there anything else we need to cover this

11   afternoon?

12             MR. PAYLOR:  No, Your Honor.

13             MS. CORNEJO:  No, Your Honor.  Thank you.

14             THE COURT:  Okay.  Before you leave, Ms. Cornejo,

15   we're going to make a photocopy of Exhibit Number 3 --

16             MS. CORNEJO:  Yes, sir.

17             THE COURT:  -- and give you back your original.

18             MS. CORNEJO:  Okay.  Sounds good.

19             Is this the original, Milton?  I have the

20   original; right?  I'm confused now.

21             THE COURT:  I thought you gave us the original.

22             MS. CORNEJO:  I did.  Okay.

23             THE COURT:  We're going to give it back to you.

24             MS. CORNEJO:  Okay.  I understand.  Thank you.

25             THE COURT:  Thank y'all.
```

1          MR. PAYLOR:   Thank you, Your Honor.

2              (Adjournment at 3:14 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1                        C E R T I F I C A T E

2

3

4          I, CATHERINE J. PHILLIPS, Fellow of the Academy of

5    Professional Reporters, Registered Merit Reporter, Certified

6    Manager of Reporting Services, do hereby certify that the

7    foregoing 53 pages are, to the best of my knowledge, skill,

8    and abilities, a true and accurate transcript from my

9    stenotype notes of the MOTION TO SUPPRESS (RESUMED) on the

10   15th day of December, 2020, in the matter of:

11

12

13   UNITED STATES OF AMERICA

14   vs.

15   KRISTOPHER HARRIS

16

17   Dated this 8th day of January, 2021.

18

19   S/ CATHERINE J. PHILLIPS, FAPR, RMR, CMRS
     Official Court Reporter
20   United States District Court
     Western District of Tennessee
21

22

23

24

25

                        UNREDACTED TRANSCRIPT